# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**STEPANOVICH et al.,**

     **Plaintiffs,**

**v.**                        **CASE NO. 2:14-CV-270-PAM-MRM**

**KYLE BRADSHAW, et al.,**

     **Defendants.**

---

## PLAINTIFFS' REQUEST FOR NEW TRIAL PURSUANT TO FRCP RULE 59

---

The trial of the above-reference case was commenced on February 6, 2017.  On February 16, 2017 the jury returned a verdict in favor of Defendant, Kyle Bradshaw, on all counts.  Plaintiffs, through their counsel, respectfully move for a New Trial pursuant to Federal Rule of Civil Procedure 59.  In support of this Motion, the Plaintiffs state as follows:

## I.  INTRODUCTION AND SUMMARY OF EVIDENCE

On November 9, 2015, Kyle Bradshaw ("Bradshaw"), with his current legal counsel present, admitted during his sworn deposition, in multiple passages, that he entered Plaintiffs' home without a warrant, consent, or exigent circumstances to arrest Monika Mozolicova ("Mozolicova") for misdemeanor offenses.   These admissions, as evidence under Rule 32 of the Federal Rules of Civil Procedure, provided unchallenged evidence that went directly to Plaintiffs' Count I Invasion of Privacy claim in their Corrected Second Amended Complaint.  (Doc 220).  Under Eleventh Circuit law Defendant's admissions should have enabled the Court to rule that Bradshaw had unlawfully entered Plaintiffs' home when he crossed the threshold of their home.

On January 23, 2017, in line with the Court's Agenda for Final Pretrial Conference, Plaintiffs filed their requested video deposition designations, with counter designations and objections included, of Bradshaw's admissions at his deposition. (Doc. 300).[1]    Plaintiffs' requested designations included parts of 56 pages of Bradshaw's civil deposition where he unambiguously admitted that he entered Plaintiffs' home to arrest Mozolicova without a warrant, consent, or exigent circumstances.  The Court denied Plaintiffs' request to play in the admissions pursuant to FRCP Rule 32, erroneously noting that "Plaintiffs' counsel has designated at least half of the two-volume, 200-page deposition for use during Plaintiffs' case in chief." (Doc 305 at 1).

The Court cited to *Coughlin v. Capitol Cement Co.*, 571 F. 2d 290, 308 n. 31 (5th Cir. 1978), for the proposition that Rule 32 "does not require the Court to allow such an introduction; the court retains substantial discretion to exclude evidence that is repetitive or otherwise unnecessary." (Doc. 305 at 1).    Contrary to the Court's holding, the *Coughlin* Court determined that the trial court's decision to disallow the admissions in portions of depositions was error, but that the plaintiff there was not prejudiced by the court's decision.  *Coughlin* at 308.  In finding no prejudice, the court recognized that "there has been no showing either below or on appeal that [defendant's] live testimony fell short of any appearing in the deposition …" *Id.*

The case at bar is inapposite to the *Coughlin* holding since Bradshaw's trial testimony irrefutably contradicted his deposition testimony regarding an ultimate issue of liability.  In other words, Bradshaw committed perjury during the trial about a critical issue he previously admitted to, which would have amounted to a concession of liability on Plaintiffs' Fourth Amendment Invasion of Privacy claim.  Plaintiffs' counsel informed the Court on multiple occasions at trial that his trial strategy was dependent on playing Bradshaw's deposition designations during

---

[1] The designations were slightly revised and refiled on January 25, 2017 after Plaintiffs received missing pages from Defendant's designations. (Doc 303).

Plaintiffs' case in chief.  (Doc 368 at 7:7-9; Doc 369 at 3:5-8; Doc 370 at 5:2-5).  If Bradshaw testified consistent with his civil deposition, then the error would not be prejudicial.  Since, however, Bradshaw completely changed his testimony and lied on the stand about how he entered Plaintiffs' home, this error directly affected the outcome of the case.

Plaintiffs filed a Motion for Judgment as a Matter of Law at the close of their case (Doc. 340) and presented the Motion in open Court on February 15, 2017.  If Plaintiffs had been allowed to present the evidentiary video admissions of Bradshaw there would have been no evidence opposing Plaintiffs' Motion.  Instead, because Bradshaw chose to lie, his fabricated version of events was the only evidence that contradicted his own previous admissions regarding his unlawful entry into the home.  The Court denied Plaintiffs' motion.

Compounding matters, Plaintiffs' spent their entire case referencing a "line in the sand" that, if crossed, constituted a civil rights violation unless Bradshaw possessed a warrant, consent, or exigent circumstances.  Plaintiff submitted multiple proposed instructions which referenced the Supreme Court's recognition that the Fourth Amendment has drawn a firm line at the entrance to the home and that an invasion by even a fraction of an inch is a violation.  Plaintiffs cited both the Supreme Court case of *Payton v. New York*, 445 U.S. 573, 590 (1980) and the Eleventh Circuit case of *McClish v. Nugent*, 483 F.3d 1231, 1239 (11th Cir. 2007).  See also, Plaintiffs' Proposed Non-Pattern Jury Instructions No. 3, (Doc 291 at 35) and No. 5 (*Id.*, at 39).

Despite Plaintiffs' requested instructions the Court gave a much different instruction regarding Bradshaw conducting an "unreasonable search of one's home or dwelling."  Jury Instruction No. 12, (Doc 356 at 12).  Plaintiffs' counsel objected at the charging conference arguing that, in line with *Payton* and *McClish,* a Fourth Amendment Invasion of Privacy instruction should have a "bright line" element regarding the crossing of the home's threshold or else it would confuse

the jury.  (Doc 372 at 8:16-9:2).  Plaintiffs' counsel was also denied when he requested an instruction regarding the burden shifting to Bradshaw for probable cause and exigency on the hot pursuit issue as set forth in *McClish*.   (Doc 372 at 5:16-25; 10:21-25).   See also, Plaintiffs' proposed instruction No. 23 (Document 339 at 5).

The pivotal issue of the entire case boiled down to whether or not Bradshaw unlawfully entered Plaintiffs' home.  Defendant offered a video into evidence which was played multiple times.   The video depicted Mozolicova interacting with Bradshaw and other officers while receiving the initial noise violation citation.   Annamirija Miric ("Miric"), a non-party, recorded the video and can be heard making rude and offensive comments on the video, including disparaging statements about the officers.   Miric never appeared at trial.   Plaintiffs' counsel objected based on hearsay, relevance, and Federal Rule of  Evidence 403, since the prejudicial affect of Miric's commentary far outweighed the probative value of the video.[2]  (Doc 364 at 3:3-4:6).  The 403 objection was based on prejudice, the video being cumulative, and the video showing only that Mozolicova was compliant.  The objection was brought up again the next day.  (Doc 365 at 3:22-4:5).  The Court ultimately ruled that the outside video with non-party commentary was "equally admissible" to the video taken inside the apartment.  *Id.* at 4:6-10.

In addition to these issues, during closing argument defense counsel repeatedly referred to deposition testimony from Bradshaw's December 2012, criminal deposition that never came into evidence.  Plaintiffs objected on the basis that defense counsel was mischaracterizing the record, but was overruled by the Court.  The case was submitted to the jury on February 16, 2017.  The jury submitted a question to the Court while they were deliberating asking for "Deposition with Bradshaw from yesterday and today" and specifically "We would like to see the whole questioning

---

[2] Plaintiffs also filed a Motion *in Limine* seeking to exclude the video.  (Doc 272 at 8-9).

prior to what we heard yesterday.  Is this possible?" (Doc 375 at 3:5-10).  The Court responded

"No. You will have to rely on the evidence presented and no additional matters." *Id.* at 4:11-17.

Clearly the jury was asking for similar evidence to what Plaintiff initially requested to play to the

jury in his 56 pages of deposition designations of Bradshaw submitted to the Court prior to trial.

## ARGUMENT

Plaintiffs believe that they are entitled to a new trial, as a matter of law, for several

reasons which are set forth in detail below.

## II.    GROUNDS FOR NEW TRIAL

Under *Rule 59*, a trial judge "may, on motion, grant a new trial on all or some of the

issues—and to any party— [...] after a jury trial, for any reason for which a new trial has

heretofore been granted in an action at law in federal court." *Fed. R. Civ. P. 59(a)(1)*. A motion

for new trial is left to the discretion of the trial court. *Lambert v. Fulton County*, 253 F.3d 588,

595 (11th Cir. 2001).  "A less stringent standard applies to a motion for new trial than to a

motion for judgment as a matter of law: even where there are insufficient grounds for granting a

renewed motion for judgment as a matter of law under Rule 50(b), a motion for new trial may be

granted where the verdict is against the great weight of the evidence." *Dudley v. Wal-Mart*

*Stores, Inc.,* 166 F.3d 1317, 1320 n.3 (11th Cir. 1999).

"It is the judge's right, and indeed his duty, to order a new trial if he deems it in the

interest of justice to do so." *11 Wright, Miller, Kane, Federal Practice and Procedure Ch.8 p.*

*45, § 2803*. It is the duty of the trial judge to set aside a verdict and grant a new trial based upon

evidence which is false or perjurious, or if the verdict results in a miscarriage of justice. *Fount-*

*Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1302 (9th Cir. 1978). Other Courts also recognize

that where false testimony resulted in the verdict, a new trial should be granted. *Akteveski v.*

*Volswagenwerk Aktiengesellschaft*, 4 F.3d 537 (7th Cir. 1993).  This Court recognizes that:

> On a Rule 59 motion,   a district court may set aside the jury's verdict and grant a new
> trial only if '(1) the verdict is against the clear weight of the evidence, or (2) is based
> upon evidence which is false, or (3) will result in a miscarriage of justice, even though

there may be substantial evidence which would prevent the direction of a verdict. *Myers v. Cent. Fla. Invs., Inc.*, No. 6:04-cv-1542-Orl-28DAB, 2008 U.S. Dist. LEXIS 98935, at *29-30 (M.D. Fla. Oct. 23, 2008).

Moreover, if the court finds that the verdict is against the great weight of the evidence, it is an abuse of discretion to deny the motion for new trial. *In re Hawaii Federal Asbestos Cases*, 871 F.2d 891, 896 (9th Cir. 1989).  In this sense the trial judge discharges his role as a "13th juror" weighing evidence and credibility. *Poynter by Pointer v. Ratcliff*, 874 F.2d 219 (4th Cir 1989).  The judge need not view the evidence from the perspective most favorable to the prevailing party in ruling on a motion for new trial.  "[W]hen independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well." *Williams v. Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982).

## III.    THE COURT SHOULD HAVE ALLOWED TO PLAINTIFFS' TO PRESENT THEIR PROPOSED DEPOSITION DESIGNATIONS DURING THEIR CASE

While a court "has discretion to exclude parts of the deposition that are unnecessarily repetitious in relation to the testimony of the party on the stand, [] it may not refuse to allow the deposition to be used merely because the party is available to testify in person." 8A Wright et al., *Federal Practice and Procedure* § 2145 (2d ed. 2008); *N. Ins. Co. v. Albin Mfg.,* No. 06-190-S, 2008 U.S. Dist. LEXIS 61043, at *11 n.4 (D.R.I. Aug. 8, 2008).  Courts recognize that:

> [A] party has a right to present its case in any judicially acceptable manner that the party chooses. If the same evidence is available to a party through both live testimony of its party-opponent and admission by its party-opponent from a deposition, the party, as part of its trial tactics and strategy, may properly elect to present the evidence by way of deposition. In this case, it is apparent from the record that plaintiff had elected to present admissions of its party-opponent by using depositions... Plaintiff had a right to do so and the trial court's refusal to allow this procedure was prejudicial error.  *United Servs. of Am., Inc. v. Empire Bank of Springfield*, 726 S.W.2d 439, 445 (Mo. Ct. App. 1987)

The Court relied on, *Coughlin v. Capitol Cement Co.*, 571 F. 2d 290, 308 n. 31 (5th Cir. 1978), in its denial of Plaintiffs' timely request to play Bradshaw's video deposition designations.  *Coughlin* actually held that the district court's refusal to allow a party to play the

deposition designations was error. *Id*. at 308.   In finding no prejudice the court recognized that "there has been no showing either below or on appeal that [Defendant's] live testimony fell short of any appearing in the deposition…" *Id.*  Such is not the case here.

Plaintiffs' made it clear in their pretrial designations, and at trial, that their trial strategy was to play Bradshaw's video deposition during Plaintiffs' case at trial.[3] (Doc 368 at 7:7-9; Doc 369 at 3:5-8; Doc 370 at 5:2-5).   Although submitted timely, the Court did not rule upon Plaintiffs' requested deposition designations to play to the jury since it held that the court had discretion to disallow the admissions being played for the jury.  (Doc 305). Notably, although Plaintiffs' counsel was requesting to play admissions of a party opponent, most of the Court's order addressed the playing of depositions of unavailable witnesses where hearsay concerns were involved.  (Doc. 305 at 2).  The Court also significantly exaggerated the number of pages Plaintiffs sought to play, which was only portions of 56 pages.  (Doc. 303).

Unlike in *Coughlin*, the significance of the Court's error cannot be overstated.  If Plaintiffs were allowed to play the requested deposition designations during their case in chief, or *even* those the Court ultimately allowed Plaintiff play on rebuttal, there is a significant probability that the outcome would have been different.  The deposition designations unambiguously show that Bradshaw admitted he entered Plaintiffs' home without a warrant, consent, or exigent circumstances.  Bradshaw's admissions include:

> At that point in time, I honestly don't think that it crossed my mind. And, in my mind, that I could literally see her, and she was a foot away from me, and I literally reached out and grabbed her. I think, at that point it was just we were in such close proximity, I really didn't even – the point of her being inside of a residence genuinely didn't even cross my mind. It's just we asked her to turn it down, they said no. I have asked her to step outside, we're going to take you into custody. No.

> At that point, we reached in, she slapped my hand off, we began to have the confrontation with Miric, and obviously, when I went in, I thought it was -- I unfortunately thought it was legal.  (Doc 371, 7:22-8:9).

---

[3] Plaintiffs' counsel recalls there being at least one other sidebar where he expressly informed the Court that his trial strategy was to play the admissions during his case in chief. The Court responded that the admissions could be played on rebuttal.

If Plaintiffs were allowed to present admissions from Bradshaw that he unlawfully entered Plaintiffs' home *before* Bradshaw perjured himself, there is a strong likelihood the result at trial would have been different.  The Court also would have had no evidence before it contradicting Bradshaw's admissions that he unlawfully entered Plaintiffs home when Plaintiffs' moved for Motion for Judgment as a Matter of Law pursuant to Rule 50.

The only arguable evidence that Bradshaw did not first enter the home would have been presented when opposing counsel read in Bradshaw's criminal deposition during the testimony of Dr. Paul McCauley ("McCauley).  However, even the criminal deposition of Bradshaw did not alleviate liability since it did not show any evidence that Mozolicova committed a felony outside her home.  The only evidence on the subject generated during McCauley's testimony was when defense counsel read Bradshaw's criminal deposition as the prelude to a question, stating:

> And then Monika Mozolicova came outside of the unit where we were trying to effect an arrest on Miric, grabbed Miric, and was trying to pull her back inside the unit as we were trying to take her into custody.  (Doc 367 at 24:18-21).

Plaintiff's counsel objected to Defense counsel reading hearsay testimony from Bradshaw into evidence during McCauley's testimony, which was overruled by the Court.  *Id.* at 23:11-22. The Supreme Court has held that "experts are generally precluded from disclosing inadmissible evidence to a jury… if such evidence is disclosed, the trial judges may and, under most circumstances, must, instruct the jury that out-of-court statements cannot be accepted for their truth…" *Williams v. Illinois*, 567 U.S. 50, 132 S. Ct. 2221, 2241, 183 L.Ed.2d 89, 113 (2012). While this portion of Bradshaw's prior testimony may have come in for other purposes, *Williams* mandates that it could not have come in for the truth of the matter(s) asserted.

In addition, the jury required more context from the civil deposition and specifically requested it. The jury submitted a question to the Court while they were deliberating asking for

"Deposition with Bradshaw from yesterday and today" and specifically "We would like to see the whole questioning prior to what we heard yesterday. Is this possible?" (Doc 375 at 3:5-10). The Court responded "No. You will have to rely on the evidence presented and no additional matters." *Id*. at 4:11-17.  The jury was entitled to the more global context of Bradshaw's admissions that Plaintiffs intended to provide.  The Court's limitation of this evidence was prejudicial to Plaintiffs in that regard.

## IV.   THE COURT DID NOT INSTRUCT THE JURY IN ACCORDANCE WITH THE PREVAILING LAW

It is settled law that plaintiffs are entitled to have the jury instructed on their theory of law 'if there [was] sufficient evidence to support such a theory.' *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 304 (5th Cir. 1978).  Jury instructions are reviewed "*de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party. *Palmer v. Bd. of Regents of the Univ. Sys.*, 208 F.3d 969, 973 (11th Cir. 2000); *Johnston v. Companion Prop. & Cas. Ins. Co.*, 318 F. App'x 861, 864 (11th Cir. 2009). "So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions. *Palmer,* at 973.  "Reversal is only warranted if the failure to give the instruction resulted in prejudicial harm to the requesting party." *Id.*

Plaintiffs' strategy at trial, from beginning to end, focused on Bradshaw admitting that he crossed the threshold of their home.  In support of this position Plaintiffs submitted Proposed Non-Pattern Jury Instruction No. 3 which stated that if the officer does not have a warrant, consent, or exigent circumstances then "the law dictates that any crossing of the threshold of the home, by even a fraction of an inch, is too much", citing to both *McClish* at 1239, and *Payton* at 590.  (Doc 291 at 35). Instead of providing this requested instruction, or an instruction reflecting the bright line law, the Court provided an instruction that "every person has the right not to be subjected to an unreasonable search of one's home or dwelling." (Doc 356 at 12).  The Court's instruction was vague and did not accurately reflect the law.  In fact, it stated absolutely nothing

about the specific limitations on police entry into a private home, although the law in the Eleventh Circuit is rife with language supporting Plaintiffs' "threshold" argument.

Plaintiff objected to the language in the Court's instruction in both the off-record charging conference and on record charging conference arguing that:

> As for the invasion of privacy, I believe, in accordance with *Payton*, in accordance with *McClish*, that the line is always delineated. You know, when you talk about the invasion of privacy. And I think, if we're switching back on the jury and just talking about a search right now, search of a home, without really talking about that bright line, I think it is going to confuse the jury. You know, concerning what we've been arguing the entire case. So in, light of *Payton*, I think it would be appropriate, and I believe it's in Plaintiff's proposed instruction to at least reference the crossing of the threshold as the line that an officer crosses to establish that claim.  (Doc 372 at 8:16-9:2).

The Court denied Plaintiffs' objection, holding that "I really think that this instruction, as drafted, gives the jury sufficient guidance for determining the 4th Amendment violation…" *Id*. at 9:19-21.

Plaintiffs' proposed instruction, in accordance with the caselaw, also did not include language requiring the jury to find that Bradshaw caused their damages.  (Doc 356 at 12-13). The Court's instruction on illegal searches instructed the jury that for Plaintiffs to prevail they must find "Bradshaw's conduct caused Plaintiffs' injuries if Plaintiffs would not have been injured without Bradshaw's conduct, and the injuries were a reasonably foreseeable consequence of Bradshaw's conduct." *Id*. at 13.  This part of the Court's instruction on damages was also prejudicial error.  "The law recognizes that law-abiding citizens can sue and recover general (or presumed) damages for a Fourth Amendment violation, even without proof of injury". *Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001); *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992) ("But if your home is illegally invaded…you can seek substantial compensatory damages without laying any proof of injury before the jury…").

Plaintiffs also submitted Proposed Non-Pattern Jury Instruction No. 23 requesting "[u]nder the law of exigent circumstances, an officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified."  (Doc 339 at

5).  Plaintiff objected to the Court's hot pursuit exigency instruction and requested inclusion of the "burden shifting for probable cause and exigency as stated in the *McClish* case, and also in *Frias v. Demings* case." (Doc 372 at 10:21-24).  The Court refused to provide this instruction or supplement the exigency of hot pursuit instruction stating "I think the instruction as presented is appropriate and sufficient, and I'm going to give as presented and deny the requests". *Id*. at 11:4-6.  The law in the Eleventh Circuit is clear that "a warrantless search of a person's home is presumptively unreasonable. *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002); *Frias v. Demings,* 823 F. Supp. 2d 1279, 1283 (M.D. Fla. 2011).  The law is also clear that when crossing *Payton's* line the government bears the burden of proving both that the officers had probable cause *and* that there was exigency. *Id.*

Plaintiffs' also submitted Proposed Non-Pattern Jury Instruction No. 21, which represented that in order for hot pursuit to apply "the arrest must have been set in motion in a public place, and some sort of chase must have occurred." (Doc 339 at 1).  The Court did not provide this requested instruction or supplement its own hot pursuit instruction.  For the exigency of hot pursuit to apply "the arrest must have been 'set in motion in a public place.' Furthermore, 'some sort of chase' must have occurred…which involves the 'immediate or continuous pursuit of the suspect from the scene of a crime,'" *Bratt v. Genovese*, 660 F. App'x 837, 841-42 (11th Cir. 2016).  There was no evidence of a public arrest or a chase in this case.

The issue of whether Bradshaw breached the threshold of Plaintiffs' home was hard fought, and predominated throughout the trial.  Plaintiffs were armed with admissions from Bradshaw, and others, that Bradshaw crossed the threshold.  Bradshaw's only defense to this evidence was his pervasive perjury.  *See Infra.*  The Court's refusal to instruct the jury regarding the line at the threshold to Plaintiffs' home, and errors in failing to accurately provide the jury the law regarding damages, burden shifting, and hot pursuit were a substantial factor in the jury's decision to find Bradshaw not guilty. As a result, a new trial is warranted.

V.      **DEFENDANT'S IRRECONCILABLE PERJURY COMPELS A NEW TRIAL**

The Eleventh circuit recognizes that "perjury[4], regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals." *United States v. Holland*, 22 F. 3d 1040, 1047 (11th Cir. 1994). Perjury is "an assault on the cornerstone of our judicial system." *Tasby v. United States*, 504 F. 2d 332, 336 (8th Cir. 1974). "Perjury strikes at the heart of the integrity of the judicial system…" *United States v. Stokes,* 211 F. 3d 1039, 1046 (7th Cir. 2000). It "undermines the function and province of the law and threatens the integrity of judgments." *United States Alvarez,* 132 S.Ct. 2537, 2540, 183 L.Ed.2d 574 (2012). Perjury "poisons the life blood of the administration of justice." *United States v. DiStefano*, 464 F.2d 845, 854 (2nd Cir.1972).

If a verdict is based on false testimony, the district judge has the discretion under Rule 59 to grant the injured party a new trial. *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993). The standard in relation to granting a new trial based on false evidence was stated in the case of *Davis v. Jellico Comty. Hosp. Inc.* which held:

> A new trial should be granted where the court is reasonably well satisfied that the testimony given by a material witness is false; that without it, a jury might have reached a different conclusion; that the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial. *Davis v. Jellico Comty. Hosp. Inc.*,  912 F.2d 129, 133 (6th Cir. 1990).

Courts recognize that the question when perjury is alleged is whether the false statements were material when they were made. *United States v. Abroms*, 947 F.2d 1241, 1246 (5th Cir. 1991). "A false statement is material if it has 'a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it is addressed…the statement need not *actually* affect the decision." *United States v. Grigsby*, 692 F. 3d 778, 785 (7th Cir. 2012). "Allowing [perjury] to happen without consequence sets a poor precedent – a court must be mindful of its responsibility 'to deter future parties from trampling upon the integrity of the court.'" *Alexander v. Caraustar Indus.*, 930 F. Supp. 2d 947, 959 (N.D. Ill. 2013). "No fraud is

---

[4] The four elements of perjury are: (1) testimony under oath or affirmation, (2) that is false, (3) that is material, (4) given with the willful intent of falsehood and not resulting from mistake, confusion, or faulty memory. *United States v. Stallings,* 194 Fed. Appx. 827, 2006 U.S. App. LEXIS 22879 (11th Cir. 2006). All elements are present here in light of Defendant Bradshaw's conduct at trial.

more odious than an attempt to subvert the administration of justice." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251, 64 S. Ct. 997, 88 L. Ed. 1250, (1944).

When determining whether to grant a new trial "the threshold question is whether Defendants proffered false testimony." *Johnson v. VeriSign, Inc.*, 2002 U.S. Dist. LEXIS 13229, at *43 (E.D. Va. 2002)(citing *Sanden v. Mayo Clinic*, 495 F.2d 221, 225 (8th Cir. 1974)). When making this determination, courts may review documents submitted on summary judgment. *Johnson*, at *44-45. Once the court determines that the defendant lied "the next question is whether the jury might have reached a different conclusion without false testimony." *Id.* at *52. The "Courts should not countenance verdicts that even appear to be based on false testimony." *Id.* at *56. When the evidence "is so thoroughly undermined by their false testimony…failing to grant a new trial would be tantamount to approving the use of false evidence to garner a favorable jury verdict." *Id.* at *57.

As the court in *Budoff v. Holiday Inns, Inc.,* 732 F.2d 1523 (6th Cir. 1984) held:

> There is a class of cases where some irregularity so taints the trial that the appearance of impropriety compels a new trial as a prophylactic rather than remedial measure. As was stated long ago, the fountains of justice must be kept pure and free from suspicion, or the citizen will lose all respect for the laws, and the rights of persons, and property will become insecure." *Id.* at 1526.

In *Alexander v. Caraustar Indus.*, 930 F. Supp. 2d 947, 954 (N.D. Ill. 2013), the Court addressed the implications of parties perjuring themselves through prior sworn statements stating:

> The contention that the discrepancy between the facts admitted at the deposition and those falsely claimed in the declarations establishes a genuine issue of fact is startling…How the discrepancies between the admissions at the depositions and prior perjurious declarations can create a genuine issue of fact is not explained, and in any event, is utterly devoid of any merit. *Id.*

The Court in arriving at its decision that the appropriate sanction was dismissal of the case noted that "[n]o Plaintiff has offered a plausible explanation for the differences between the declarations and the depositions." *Id.* at 961. Here, just like in *Alexander*, Bradshaw has provided no credible explanation for the differences in his testimony.

In the present case Bradshaw wrote in his sworn probable cause affidavit that:

Officers advised MOZOLICOVA to step outside, so officers could affect an arrest for disorderly conduct and City Ordinance Violation 22-37 Noise Violation. Mozolicova refused to step outside of the unit, at which point officers attempted to take physical custody of MOZOLICOVA inside of the unit. (Doc 154-3; Trial Px93).

On December 5, 2012, when Bradshaw was asked specifically about the probable cause

affidavit he stated under oath:

Q.  Okay.  "And blocked full access to Mozolicova."  Then it goes on, the next sentence, "Mozolicova hit Officer Bradshaw's arm and pulled away."

A.  Uh-huh.

Q.  So were you in the unit at that point in time?

A.  Huh-uh.  I don't - - I don't specifically recall.  I don't think that we breached the door frame.  However, indicative of that statement, I don't recall.  (Doc 347 at 118:24-119:8 *reading in page 79:4-11 of his criminal deposition at Doc 151-14).*

Despite his uncertainty at the criminal deposition, Bradshaw had admitted several months

prior to his criminal deposition that he broke the plane of Plaintiffs' home to take Mozolicova

into custody.  As Bradshaw's Supervisor, Michael Herman, recounted[5]:

A….Officer Bradshaw but breaking the plane of the door for the noise complaint to try to take Monika into custody was a mistake on his part. We know it. The State knows it. We all know it. We've all acknowledged it. Officer Bradshaw knows it.

Q.      When did he acknowledge it last?

A,      What do you mean last?

Q.      Did you have a conversation with him where he acknowledged it?

A. We had a meeting with the State Attorney's in reference to the defendants and the cases and the charges and how we were going to proceed. So we had all discussed it then, and he understood it beforehand because we had all discussed it.  (Doc 151-17; 42:14-43:2).

Any ambiguity about Bradshaw admitting liability was clarified by Herman, who stated:

[5] Despite the Court's ruling that evidence of the officers' meeting with the State's Attorney was privileged, the Court was aware of the substance of this meeting, and also aware of Bradshaw's numerous admissions.  As a result, the Court was aware that Bradshaw's testimony at trial was completely contradictory to his prior sworn testimony.

Q. But internally? Was there anything memorialized of the meeting? Any paperwork? Any e-mails to the State Attorney's Office of so and so date?

A. No, there was not. It was simply a meeting with members of the State Attorney's Office or Mr. Gorman to go over the status of the case and why certain charges were going forward and others weren't, and effectively a strategy meeting. They explained where the limitations were, the issue of the threshold of the door came up. *And, again, Mr. Bradshaw readily acknowledges that it's clear and that it was a mistake as going across the threshold of the door*, and the charges were amended accordingly.  (emphasis added).  (Doc 151-17 at 47:6-20)(emphasis added).

Herman then confirmed that the initial charges against Plaintiffs' were all dismissed due

to Bradshaw's unlawful actions:

Q. Well, by the same argument I would maybe not classify entering someone's home without a warrant to be accidental. And I don't want to - -

A. And the State has amended the charges accordingly.

Q.        Right.

A.        So, in other words, the ramification for Officer Bradshaw breaking the plane of the door for the misdemeanor offense has been dealt with and the charges going along with that have been dropped, so there was a ramification for that action.

Q. They're not dropped. They're still on criminal record.

A. Well, the ones dealing with the action of the noise complaint -- the ones dealing specifically with those misdemeanors, that particular misdemeanor was amended because of an improper act on the officer's part--

Q. Right.

A. -- to initiate that arrest. The State amended the charges because of the deficiency and how that was done.  (Doc 151-17; 37:19-38:15).

The charges as outlined by Herman were filed and dismissed by the State on September

25, 2012, several months before Bradshaw's criminal deposition.  (Doc 154-41).  Bradshaw's

acknowledgement that he entered Plaintiffs' home unlawfully was so well known, and conceded,

that the State admitted *all* of the following in a document that remains public for anyone to see:

"8. One or more of the occupants of the apartment denied consent for the Naples Police Department Officers to enter the apartment.

9. Naples Police Department Officers lacked any warrant to enter the apartment.

10. The Naples Police Department lacked exigent circumstance to enter into the apartment.

11. Naples Police Department Officer Bradshaw entered the condo unit to arrest Ms. Mozolicova."  (Doc 151-20 at 2; Doc 151-21 at 2).

Bradshaw's admission that he went in the home unlawfully was also corroborated by the assisting officer, Ryan Harp ("Harp") who testified accordingly at his own deposition:

Q. So she said -- what did she say, no I'm not coming out?

A. Pretty much.

Q. All right. So what did he do at that point?

A. He tried to effect the arrest on the female

Q. He opened the door?

A. He did not open the door. The door was open.

Q. Okay. But he went into the apartment?

A. Yes. We were in the doorway.

Q. Across the threshold?

A. Yes, sir.

Q. Okay. To affect the arrest?

A.  Yes, sir.

Q. And can you do that as a sworn officer? Is that okay? Can you do that on a misdemeanor?

 A. No.

Q. No, you can't, can you? Okay. So he grabs her and brings her outside?

A.  Yes sir.  (Ryan Harp, 11:14-12:16; Doc 154-2; 37:9-38:2)

During his civil deposition on November 9, 2015, Bradshaw testified consistently with his prior admissions (and those of Harp) that he unlawfully entered Plaintiffs' home.  When asked about his arrest affidavit he admitted that he did not have a warrant or consent to enter the home responding:

Q: "Mozolicova refused to step outside of the unit." So that point in time she told you, I'm not coming outside. And you already knew, you were told if you wanted to come in, get a warrant?

A. Yes, sir.

Q. Okay. "At which point officers attempted to take physical custody of Mozolicova inside of the unit." So you attempted at that point in time to take custody of her inside the unit?

A. Yes, sir.

Q. Why were you going in the unit at that point in time?

A. It's obviously been clarified to this point, but at the time and when this incident occurred, I didn't know that breaching a doorway would require a warrant. I thought because we could see her and, obviously, were communicating with her that we could simply take custody of her. *So that was something that I acted on*, that we acted on at that point that was later clarified. (Doc 151-13; 96:3-22) (emphasis added).

Bradshaw made other admissions that made it crystal clear that he entered Plaintiffs'

home unlawfully during the November civil deposition including:

Q. Okay. Did you believe that you could go into the house completely? Was that your understanding?

A. Yes, sir.

Q. So if, for instance, she was on the other side of that door, you could go completely through that door in order to arrest her for a misdemeanor noise violation. That was your understanding? And I'm not asking you now but at that point in time.

A. At that point in time, I honestly don't think it crossed my mind. I think in my mind that I could literally see her and she was a foot away from me, and I literally reached out and grabbed her, I think at that point it was just that we were in such close proximity I really didn't even -- the point of her being inside a residence genuinely did not even cross my mind. It's just, you know, we've asked her to turn it down, they said "No;" I've asked her to step outside, we're going to take you into custody, "No," okay. At that point we reached in, she slapped my hand off. We began to have the confrontation with Miric. And, you know, obviously, when I went in, I thought it was, I, unfortunately, thought it was legal. (Doc 151-13; 100:12-101:8)

Another admission is equally as clear:

Q. Okay. So I'm going to read the sentence once again. It says, "Mozolicova refused to step outside of the unit, at which point officers attempted to take physical custody of Mozolicova inside of the unit." All right. So you guys had your hands on her inside of the unit at that point, right?

A.  Yes, sir.

Q. Okay. So do you remember if you were actually in the home at that point when you first put your hands on Mozolicova?

A. I recall that we were in the doorway because Miric was still in between us, and we were trying, basically -- Miric was being obnoxious and just confrontational the entire time, so I believe that we tried to reach around or over Mrs. Miric and to physically take Mrs. Mozolicova out of the unit and to take her into custody at that point.

Q.  And this was for the noise violation?

A.  Yes, sir.

Q. And both you and Harp got your hands on Mozolicova inside the unit?

A.  I don't recall if Officer Harp grabbed Mrs. Mozolicova when she was inside of the unit. I remember specifically trying to grab her arm and her hitting me off, and then dealing with Mrs. Miric. I'm not sure about Officer Harp, though.

Q.  Okay. "Miric stood in the way of officers and blocked full access to Mozolicova." So Miric was still, she was inside the home also, right?

A.  In the doorframe, yes, sir. I'm not sure if she was partially out of the door or not, but she was in that doorframe area as well.

Q. And Mozolicova was behind her?

A.  Yes, sir.  *Id*. at 103:8-104:16

Bradshaw made numerous other unambiguous admissions at the civil deposition, never

once back-tracking from these statements, including:

- "I believe I recall that we said something in to the doorframe before I even reached in." *Id*. at 103:1-2.
- Admitting Mozolicova struck him when he reached in to grab her and that she didn't go back in to the unit, but rather she "went further inside of the unit." *Id*. at 104:20-105:8
- At the time of the incident, I believed that it was lawful. But in review of everything and in hindsight, I agree that I shouldn't have gone inside of the unit to take Mrs. Mozolicova into custody. *Id*. at 108:13-17.
- I'm not sure if it's unlawful or what a terminology would be, but it definitely shouldn't have done it. *Id*. at 108:24-109:1

Bradshaw also made it patently clear that Mozolicova never struck him outside the home

stating:

Q.  And Harp's got Miric, right?

A.  That's correct. As we're taking Mrs. Miric into custody, Mrs. Mozolicova came out of the unit and tried to interact, or interject, or try to pull Mrs. Miric back inside of the unit, so we're trying to take Mrs. Miric into custody, Mrs. Mozolicova comes outside of the unit, we attempt to take Mozolicova into custody again at that point, I believe, and then she went back inside of the unit. At that point, Officer Harp and I were able to get Mrs. Miric handcuffed and placed her outside of the unit on the ground, and Mrs. -- and then I went back inside of the unit to attempt to arrest Mrs. Mozolicova.  *Id.* at 110:12-24

His only recollection of being struck by Mozolicova was when she hit his hand off as he

reached in to take her into custody inside the unit stating:

Q. When you say she hit you, did she just hit you once? Did she hit you multiple times? What exactly did she do?

A. I remember being struck, I believe it was the single time. I'm not sure if she hit me multiple times. But again, I'm not sure if it was with an open or closed fist, but as I was reaching in to take her into custody, I recall her striking my hand or striking my forearm area somewhere hard enough that I let go of her, and at which point she retreated back further inside the unit.

Q. So she struck you one time?

A. I don't recall if she struck me a couple of times or what. I don't recall.

Q. But you specifically recall at least one time that Mozolicova struck you?

A. Hard enough to get me to release her arm or wherever I was grabbing.

Q. Okay. So your arm is inside the unit, we've already established that, and she hit you to get you off of her?

A. That's correct.

Q. Okay. And that's the only independent recollection you have of her striking you at that point in time?

A. Yeah. I don't recall if it was -- if you're asking how many times or if it was like with an open or closed fist, I don't recall that, but that's the only --yes, sir. I mean, I remember reaching inside the unit to try to take her into custody. I remember getting my hand hit. It all happened so quickly. She retreated back inside the unit. We started dealing with Mrs. Miric. She came back outside, Mrs. Mozolicova came back outside of the unit, tried to pull Miric back. I mean, it all transpired in a matter of seconds.

Q. Okay. So you're reaching for her and she hit your hand?

A. I believe that I actually had -- I actually was grabbing a portion of her arm or upper arm or forearm. I believe that I actually had contact with her. *Id.* at 114:7-115:21.

Despite all these admissions, Bradshaw chose to perjure himself at trial about the most significant issue in the case - his entry into the home.  He materially changed his testimony to state that he was struck by Miric *before* he crossed the threshold of the home.  He stated:

Q. Okay. But your understanding of what a police officer was allowed to do is that you could actually cross that line in the sand, grab somebody in the house, and pull them out. Right?

A. At the time of the incident, I did not think of it as a line in the sand. I mean, it was a very fluid, very aggressive situation that was occurring very quickly. *At the point in time that I reached in towards Mrs. Mozolicova, again, I was outside of the doorway. I never got into the doorway before I was struck by Mrs. Miric and we began struggling with her for hitting me*. (emphasis added) (Doc 347 at 21:10-20).

When asked the same question as in his deposition regarding his booking affidavit Bradshaw gave a completely contradictory story stating:

Q. It states that, "Officers advised Mozolicova to step outside so officers could affect an arrest for disorderly conduct and City Ordinance Violation 22-37, noise violation. Mozolicova refused to step outside of the unit, at which point officers attempted to take physical custody of Mozolicova inside of the unit."  Is it your testimony today that you did not go inside the unit to take custody of Miss Mozolicova?

A. At that point in time, no, sir.

Q.  Is it your testimony today that you didn't reach into the house and cross the line to pull Mozolicova out of the house?

A. That's correct.  (Doc 347 at 21:24-22:11).

Bradshaw's persistent perjury continued:

Q.  Do you remember if you were actually in the home at the point when you first put your hands on Mozolicova?

A.  She was outside the home. *Id*. at 23:23-25.

Bradshaw continued to pervasively lie about other areas during his testimony including:

He is "absolutely certain" Miric was outside the doorframe. *Id.* at 24:23-25

Denying that Monika struck him when he reached into the home.  *Id*. at 25:14-16

Miric came outside the house and pushed him.  *Id*.  29:2; 76:11-22; 77:13-17

Monika hit him outside the house.  *Id*. 29:7-9; 31:8-9; 78:11-17.

Bradshaw's lies went to the central issue of the case - his unlawful entry into Plaintiffs'

home.  Bradshaw never once attempted to explain the material differences between his civil

deposition and his trial testimony.  If Bradshaw had testified consistently with his sworn

deposition it would have provided uncontradicted evidence to the Court on Plaintiffs' invasion of

privacy claim and allowed the Court to grant Judgment as a Matter of Law.  On Summary

Judgment, an attempt to create a material fact with inherently contradictory evidence would have

been considered a sham affidavit and disallowed.  *Knight v. Miami-Dade Cty.,* No. 09-23462-

CIV-TORRES, 2012 U.S.  Dist. LEXIS 194476, at *31-32 (S.D. Fla. 2012).

Plaintiff was pro-active in taking steps to eliminate surprise by taking the video

deposition of Bradshaw which should have locked him into his sworn testimony.  In an effort to

prevent potential perjury from Bradshaw, Plaintiff submitted 56 pages of Bradshaw's sworn

video deposition to the Court to play as admissible evidence of a party opponent during

Plaintiffs' case in chief.  Plaintiff also sought to play admissions from Herman as impeachment,

showing that Bradshaw admitted both at a meeting with the prosecutor and *before* that he

unlawfully entered the home without a warrant, consent, or exigency.  If Plaintiff had been

allowed to meet Bradshaw's perjury with these tools the jury would have likely returned a

different verdict.  However, because the Court disallowed Plaintiffs' various requests, Bradshaw

was allowed to lie with impunity, which ultimately paid off with a verdict in his favor.

## VI.    DEFENDANT IMPROPERLY ARGUED FACTS NOT IN EVIDENCE

A new trial is properly granted when it is based on improper jury argument including

closing argument.  *Caudle v. District of Columbia*, 707 F. 3d. 354, 359 (D.D.C. 2013).   The

overriding theme of Bradshaw's closing argument, repeated numerous times, was that Bradshaw

consistently testified since December 2012 that Mozolicova came outside the house and struck

him.  However, that testimony from Bradshaw was not in evidence.  When Plaintiffs' counsel

objected that Defense counsel was mischaracterizing the facts the court overruled the objection stating "[t]he jury will recall the testimony."  (Doc 374 at 60:23-61:8).

When an objection is properly made, review by the Court "will ascertain whether the remarks affected a substantial right." *Allstate Ins. Co. v. James,* 845 F.2d 315, 319 (11th Cir. 1988). This Circuit recognizes that "[o]verruling an objection connotes a certain approval of the direction of counsel's argument and refusal to limit its impact through an instruction heightens the possibility that a jury will be persuaded by an improper tone or suggestion within those comments". *Allstate Ins. Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).  "[W]here the interest of substantial justice is at stake, improper argument may be the basis for a new trial even if no objection has been raised." *Christopher v. Florida*, 449 F.3d 1360, 1366 (11th Cir. 2006).   New trials have been granted and upheld where counsel referred to exhibits not in evidence. *McWhorter v. City of Birmingham,* 906 F.2d 674, 677 (11th Cir. 1990).

During closing, defense counsel attacked Plaintiff's theory regarding Bradshaw's admitted unlawful entry by referring to testimony of Bradshaw at a prior criminal deposition in December, 2012.  He cited to a passage that he argued came in during the testimony of Plaintiffs' expert Paul McCauley to bolster his position that his original story that Mozolicova struck him outside.  (Doc 374 at 37:2-38:3).  The problem is that the passage he referred to as Page 40, Line 20, from Bradshaw's criminal December, 2012 deposition, never made it into evidence:

> We were able to take Miric into custody, at which point Monika was outside of the unit. I grabbed Monika, and at that point she did strike me, pulled away, and went back inside of the unit. *Id.*

This information was reiterated shortly thereafter where opposing counsel argued:

> In doing so, they're placing her under arrest, and as Officer Bradshaw testified in December 2012, Ms. Mozolicova, for whatever reason, decided to come out of the unit, go to pull Ms. Miric back into the unit, and, in doing so, Officer Bradshaw grabbed her. That's exactly what he said four and a half years ago.  And when he grabbed her, she hit him. *Id*. at 44:20-25.

The point was argued again at conclusion when he stated:

 Did Bradshaw violate Kavaja's 4th Amendment rights when he entered Plaintiffs' apartment on May 17, 2012?  That is the key question.  Do you believe Officer Bradshaw, when he testified, in December of 2012, that Ms. Mozolicova came out of the apartment, went to pull Ms. Miric back into the apartment, and when he grabbed her outside of the apartment, she struck him?  *Id.* at 60:22-61:4.

He then went to the well once again focusing on Bradshaw's 2012 deposition stating:

We keep coming back to their position that they don't believe Officer Bradshaw – that he had exigent circumstances when he testified under oath, in December of 2012, that outside of the apartment, Ms. Mozolicova interfered with his arrest of Ms. Miric and struck him.  That's a felony.  Those are the exigent circumstances.  He's allowed to go in. *Id.* at 63:11-16.

Counsel for Plaintiffs properly objected to counsel's repeated reference to this testimony, arguing that it mischaracterized the evidence.  Because the references by defense counsel were based on facts not in evidence, they were improper.  Because Defendant's entire closing argument had its basis in this non-evidence, it was clearly prejudicial to Plaintiffs.

## VII.   ERRONEOUS EVIDENTIARY RULINGS COMPEL A NEW TRIAL

"An evidentiary ruling warrants a new trial only if the complaining party's substantial rights were affected". *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004).  Evidentiary rulings are reviewed for an abuse of discretion.  *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1339 n.27, 23 Fla. L. Weekly Fed. C 1105 (11th Cir. 2012).

"[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Proctor v. Fluor Enters.,* 494 F.3d 1337, 1350 n.9 (11th Cir. 2007).   For a Court to reverse:

a party must establish that (1) its claim was adequately preserved; (2) the district court abused its discretion in interpreting or applying an evidentiary rule; and (3) this error affected "'a substantial right.'"  *Id.* at 1349.

Bradshaw offered a video taken by a non-party, Miric, which included her commentary regarding an interaction between Bradshaw, Herman, Harp, and Mozolicova.  Neither the

officers nor Mozolicova can be coherently heard on the video, and Bradshaw is in his car during most of the video.  (Doc 289; Ex. D).  By all accounts, Mozolicova is compliant with the officers.  Miric's comments on the video provide no probative value and are highly offensive and inflammatory including statements that the officers will soon have to work at McDonald's.  *Id.*

Plaintiffs filed a Motion *in Limine* to exclude the Miric commentary on the grounds that the audio portion of the video was completely irrelevant to the case and unduly prejudicial to Plaintiffs' since it imputed Miric's comments to them.  (Doc 201 at 8-9).   Plaintiffs also specifically filed objections to the video, asserting hearsay, relevancy, and under 403 was more prejudicial than probative.  (Doc 314 at 4).  The Court denied Plaintiffs' Motion *in Limine* stating "this video stuff was brought to my attention in motions in limine. The problem is I didn't have the videos, and so it's a little difficult for me to make any rulings on it." (Doc 364 at 3:14-18).

The Court initially denied Defendant's use of the audio portion of the video on opening statement, but reserved on whether the video would come into evidence.  *Id*. at 4:25-5:3. Plaintiffs objected on the grounds that the commentary was of a non-party and was a Rule 403 issue since it was more prejudicial than probative since it referenced, *inter alia*, that the officers should go work in McDonald's.  *Id*. at 3:22-4:6.  Defense counsel also pointed out that Plaintiffs' previously objected on the grounds of relevance and hearsay.  *Id*.  3:7-13.

The video was addressed again the second day of trial.  Plaintiffs' objected again on the basis of hearsay and Rule 403 stating that Miric was "very obnoxious" and that this was highly prejudicial to Mozolicova who by all accounts was polite and compliant.  (Doc 365 at 3:22-4:5). The Court overruled Plaintiffs' finding "the outside tape is equally admissible" to the inside tape that captured what happened in the apartment.  *Id*. at 4:6-10.  Plaintiff put on the record that the inside tape did not have commentary on it compared to the outside commentary.  *Id*. at 4:13-14.

The Miric video became a central piece of Bradshaw's defense.  The video was played at least twice with multiple stops to emphasize the video's audio.  Miric's commentary was so important that it was played and focused on throughout Bradshaw's closing argument stating:

> You have in evidence the very first video taken by Ms. Miric of their encounter with the police officers. We're  not going to play all of that for you now. You'll have it back there in the room. I think we played most all of it during the course of the trial, and you saw it, **where** <u>she</u> **was clearly intoxicated,** <u>she</u> **couldn't keep the camera focused on the three officers and Ms. Mozolicova, and** <u>she</u> **was abusive throughout**. She was telling them hey, this is going live on YouTube. You all will be working at McDonald's after we get through suing you. Or maybe Burger King.
>
> You saw the reaction of Officer Bradshaw, Sergeant Herman, and Officer Harp. They barely acknowledged her. No one turned around and threatened her. No one said anything abusive to her whatsoever. And, unfortunately, that's the society we're in now, where people think -- go ahead and play when you're ready. (Emphasis added).
>
> (A video recording was played as follows beginning at 10:32 a.m.)
>
> UNIDENTIFIED FEMALE: "The officers in Naples, Florida, Police Department, (unintelligible) okay, we've been escorted out for no reason at all, and I'm not even allowed to go up there and talk to them. They (unintelligible) have to go back in, they don't have no right.
>
> MR. REYNOLDS: Pause.   (Doc 374 at 39:24-40:23).

A little later in closing Defense counsel went to the well again on Miric's commentary:

> Hey, I've got a great idea. Remember **what Ms. Miric said**? Let's sue these officers so they're working at McDonald's or Burger King. Take them for all they're worth.  *Id*. at 57:2-4.

Ms. Miric did not appear at trial.  Her commentary on the video was clearly hearsay and should have been excluded.  Moreover, any reasonable analysis pursuant to FRCP 403 would result in the conclusion that the evidence was far more prejudicial than probative.  It is very clear that Defendant utilized the evidence to group Ms. Miric with Plaintiffs and impute her behavior to Plaintiffs, all to their detriment.  The Court should not have permitted this evidence.  Its inclusion was prejudicial to Plaintiffs and Plaintiffs are entitled to a new trial.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant a new trial.

Respectfully Submitted,

s/ Tammy Ray Page, Esquire
Tammy Ray Page, Esquire
Florida Bar No. 106563
Page Law, P.A.
13410 Parker Commons Blvd., Ste. 101
Fort Myers, FL  33912
Telephone:  (941) 444-9507
Facsimile:  (941) 761-5625
Primary email:  ecf@PageLawPA.com
Secondary email: trp@PageLawPA.com

s/ Stephen P. Norman, Esquire
Stephen P. Norman, Esquire
*Admitted Pro Hac Vice
The Norman Law Firm
30838 Vines Creek Road, Unit 3
Dagsboro, DE  19939
Telephone: (302) 537-3788
Facsimile:  (302) 258-0705
Snorman@TheNormanLawFirm.com

Attorneys for Plaintiffs

## CERTIFICATE OF CONFERENCE

Undersigned hereby certify that, in accordance with Local Rule 3.01(g) and prior to filing this Motion, opposing counsel was conferred with and a good faith effort was made to resolve the issue raised by the Motion.  No such agreement as to the resolution of the issue was reached.

s/ Tammy Ray Page, Esquire
Tammy Ray Page, Esquire
Florida Bar No. 106563
Page Law, P.A.
13410 Parker Commons Blvd., Ste. 101
Fort Myers, FL  33912
Telephone:  (941) 444-9507
Facsimile:  (941) 761-5625
Primary email:  ecf@PageLawPA.com
Secondary email: trp@PageLawPA.com

s/ Stephen P. Norman, Esquire
Stephen P. Norman, Esquire
*Admitted Pro Hac Vice
The Norman Law Firm
30838 Vines Creek Road, Unit 3
Dagsboro, DE  19939
Telephone: (302) 537-3788
Facsimile:  (302) 258-0705
Snorman@TheNormanLawFirm.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certify that on this 17th day of March, 2017, the foregoing was

electronically filed with the Clerk of Court using the CM/ECF system.


/s/ Tammy Ray Page, Esq.
Tammy Ray Page, Esq.
Florida Bar No. 106563
Page Law, P.A.
13410 Parker Commons Blvd., Ste. 101
Fort Myers, Florida 33912
Phone: (941) 444-9507
Fax: (941) 761-5625
Primary: ecf@PageLawPA.com
Secondary: trp@PageLawPA.com


/s/ Stephen P. Norman, Esq.
Stephen P. Norman, Esq.
*Admitted *Pro Haec Vice*
The Norman Law Firm
30838 Vines Creek Road, Unit 3
Dagsboro, Delaware 19939
Tel: 302-537-3788
Facsimile: 302-258-0705
Snorman@TheNormanLawFirm.com

Attorneys for Plaintiffs